1   Michael R. Lozeau (CA Bar No. 142893)
        e-mail:  michael@lozeaudrury.com
2   Richard T. Drury (CA Bar No. 163559)
        e-mail:  richard@lozeaudrury.com
3   Rebecca L. Davis (State Bar No. 271662)
        e-mail:  rebecca@lozeaudrury.com
4   LOZEAU DRURY LLP
    410 12th Street, Suite 250
5   Oakland, CA 94607
    Tel:  (510) 836-4200
6   Fax: (510) 836-4205
7
    Attorneys for Plaintiff
8
                            UNITED STATE DISTRICT COURT
9
                    FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   HILLS CONSERVATION NETWORK, a       )   Case No. _____
     non-profit corporation,             )
12                                        )
                  Plaintiff,              )   **COMPLAINT FOR DECLARATORY**
13            vs.                         )      **AND INJUNCTIVE RELIEF**
                                          )
14   FEDERAL EMERGENCY MANAGEMENT )
     AGENCY, a federal agency; KAREN      )
15   ARMES, in her official capacity; MARK )
     GHILARDUCCI, in his official capacity; )
16   RICHARD C. BLUM, in his official capacity; )
     WILLIAM DE LA PEÑA, in his official  )
17   capacity; GARETH ELLIOTT, in his official )
     capacity; RUSSELL S. GOULD, in his official )
18   capacity; EDDIE ISLAND, in his official  )
     capacity; GEORGE KIEFFER, in his official )
19   capacity; SHERRY L. LANSING, in her  )
     official capacity; MONICA C. LOZANO, in )
20   her official capacity; HADI          )
     MAKARECHIAN, in his official capacity; )
21   ELOY ORTIZ OAKLEY, in his official   )
     capacity; NORMAN J. PATTIZ, in his official )
22   capacity; JOHN A. PEREZ, in his official )
     capacity; BONNIE RIESS, in her official )
23   capacity; FREDERICK RUIZ, in his official )
     capacity; SADIA SAIFUDDIN, in her official )
24   capacity; RICHARD SHERMAN, in his   )
     official capacity; BRUCE D. VARNER, in his )
25   official capacity; CHARLENE ZETTEL, in )
     her official capacity; EDMUND G. BROWN, )
26
27
28

JR., in his official capacity; GAVIN          )
NEWSOM, in his official capacity; TONI        )
ATKINS, in her official capacity; TOM         )
TORLAKSON, in his official capacity;          )
SHELDON ENGELHORN, in his official            )
capacity; JANET NAPOLITANO, in her            )
official capacity; KAREN LEONG CLANCY, )
in her official capacity;  NICHOLAS B.        )
DIRKS, in his official capacity; CITY OF      )
OAKLAND, a California municipality; and       )
EAST BAY REGIONAL PARK DISTRICT, a )
special district,                             )
                                              )
          Defendants.                         )
_____)

## INTRODUCTION

1.   This is an action brought pursuant to the National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*,
challenging the decision by Defendant Federal Emergency Management Agency ("FEMA") and the
accompanying environmental impact statement ("EIS") evaluating and approving the awarding of
federal grant funding to the California Office of Emergency Services on behalf of the University of
California, the City of Oakland, and the East Bay Regional Parks District for a project entitled
"Hazardous Fire Risk Reduction, East Bay Hills, California" (hereinafter the "Project").   The Project
involves various levels of vegetation management, including clear-cutting of more than 50,000 trees,
brush removal, removal of tree limbs, herbicide applications, and other measures intended to reduce
fire risk in the East Bay Hills.   The Project's area extends over 2,059 acres of land located throughout
the East Bay Hills, extending from the City of Richmond to the area around Lake Chabot.   The
Project area has been divided into 105 discrete project areas.   Of that 2,059-acre area, FEMA has
approved grant funding for vegetation treatments in 998.3 acres including 60 of the 105 identified
project areas.   The 45 project areas not included in the FEMA funding applications are all on EBRPD
lands and are not affected by this lawsuit.

2.   Plaintiff Hills Conservation Network ("HCN" or "Plaintiff") brings this action to rectify
flaws and omissions in the EIS prepared by FEMA for the Project.   In particular, HCN objects to the

Project's reliance on large areas of clear-cutting within the University and City of Oakland project areas. Expert evidence in the record demonstrates that clear-cutting and chipping of eucalyptus will not achieve the most effective reduction of fire risks in the Project areas and instead increases fire risks by disposing of wood chips in layers up to two-feet deep over extensive areas of the Project sites. The EIS also fails to identify the ongoing weed management actions that will be necessary to control highly flammable hemlock, thistle, broom, and poison oak that will take root in clear-cut areas unless vigorously controlled. Rather than achieve the purported fire risk reduction goals identified in the EIS, the Project instead will "have the net effect of increasing the long-term wildfire hazard in treated areas." Comment Letter of Fire Behavior Analyst Fire Chief Kelly Close, M.S., p. 11.

3.   The EIS for the Project fails to grapple with these significant environmental concerns by failing to consider a project alternative, put forth by HCN and its expert fire consultant, that would apply selective thinning to the entire Project area, rather than any clear-cutting. This alternative, would, in effect, extend the vegetation management actions proposed by EBRPD for many of its Project areas to the entire Project area. EBRPD's vegetation management plans deemphasize large-scale clear-cutting as a preferred fire management tool and instead leave large trees, including eucalyptus trees in place, relying on selective thinning of trees, clearing of brush, and removal of lower limbs of trees. Instead of considering selective thinning for the entire Project area, the EIS summarily rejects this alternative as infeasible based on purported costs without referencing or identifying substantial evidence establishing that this alternative is cost-prohibitive. HCN's expert consultant submitted evidence reviewing the available information and estimated that applying selective thinning to eucalyptus forests, Monterey pines, and acacia throughout the Project area would be substantially less expensive over the five to ten year term that FEMA must evaluate to apply its long term funding goals. The expert also demonstrated that a selective thinning alternative would achieve the purpose and need of significant fire risk reduction comparable to or better than will be achieved by the proposed Project. As a result, it was entirely arbitrary of FEMA to eliminate the Project-wide selective thinning alternative from consideration in the EIS.

4.   In addition to failing to consider and analyze a feasible selective thinning alternative, the EIS also fails to address the impacts of herbicide spraying that will be required to control hemlock, broom, thistle, and poison oak in clear-cut areas of the Project;  fails to identify or discuss the fire hazard from regrowth of vegetation on the cleared sites;  fails to accurately describe or reasonably address the threat posed by piling wood chips up to two feet deep over hundreds of acres;  arbitrarily assumes that extensive, thick carpets of wood chips will promote native plants rather than hemlock, broom, thistle, poison oak and other undesirable plants; fails to identify and address reasonable opposing scientific views, in particular a critical study of eucalyptus forests and fire management that contradicts the basic theories underlying U.C. Berkeley's and Oakland's tree eradication proposals; fails to apply rational thresholds of significance for its discussion of both air quality impacts and cumulative global warming impacts; arbitrarily dilutes air pollution and GHG emissions over ten-years despite the polluting activities all occurring within one to three years;  fails to reasonably consider the Project's elimination of summer fog drip in fire prone areas and the resulting increase in fire risk; and fails to recognize the mitigation measures necessary to address the Project's harm to air quality and the climate.   In the FEIS, FEMA significantly changed the proposed Project to include a different mix of fire management actions in portions of Oakland's and the University's Project areas which was called the "Unified Methodology."  FEMA also violated NEPA by failing to circulate that significant change to the Project as a supplemental EIS.  Lastly, in the FEIS, FEMA fails to adequately respond to each of the issues raised by Plaintiff HCN and its experts.

5.   Plaintiff requests the Court to enjoin FEMA's issuance of any funds for the Project for any actions by the subapplicants in their respective project areas and to enjoin any ground-disturbing activities by the subapplicants that are or will be funded by FEMA's grant.  Plaintiff requests that the Court issue an order vacating the Record of Decision, and ordering FEMA to prepare a new supplemental EIS addressing all of the above shortcomings and reconsider its decision based on the supplemented EIS.

**JURISDICTION AND VENUE**

6.   Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief) and the Administrative Procedures Act, 5 U.S.C. §§ 701-706.  This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves an agency of the United States as a defendant, and arises under the laws of the United States, including NEPA, 42 U.S.C. 4331 *et. seq.*, and the Administrative Procedure Act, 5 U.S.C. § 500 *et. seq.*  FEMA's issuance of the ROD approving the Final EIS and the Project constitutes a final agency action.  There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7.   Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e).  Pursuant to Local Rule 3-2(c), intradistrict venue is proper in San Francisco or Oakland, California because the sources of the violations are located within Contra Costa and Alameda Counties, California.

8.   This complaint is timely filed within the applicable statute of limitations.

**PARTIES**

**A.    Plaintiff.**

9.   Petitioner HILLS CONSERVATION NETWORK is a non-profit public benefit corporation whose members reside in and near the East Bay hills that seeks to assure that fire management programs for the East Bay Hills improve fire safety while minimizing and fully mitigating environmental impacts.  HCN is governed by a board of directors.  HCN has approximately 50 active members who support the organization financially as well as volunteering their time and skills.  Members also participate in setting and guiding HCN's actions during meetings of the Board and membership.  HCN's address is located in Berkeley, California.  HCN's members include homeowners who lost their homes in the 1991 Oakland Hills Fire.  HCN's members are residents of the East Bay hills near and adjacent to the Project lands who will be negatively affected by the Project's adverse environmental impacts and improper approval.  HCN's members recreate, walk, view wildlife and plant life, reside, and otherwise use and enjoy the natural and cultural resources of the public lands that will be adversely affected by the Project.  Plaintiff and its members

have been involved in the administrative proceedings that have been provided to date for the Project, including providing extensive written comments and expert reports. Plaintiff's members' environmental, aesthetic, recreational, scenic, scientific, historic, cultural, informational, and community interests will, unless the relief requested herein is granted, be adversely affected and injured by Defendants' failure to comply with NEPA in approving the Project. Plaintiff brings this action on behalf of its members and the public interest.

10. Plaintiff exhausted all of the administrative remedies available from the Defendants. Plaintiff submitted written comments to FEMA during the administrative process conducted for the Project's environmental assessment issued in 2008 as well as the draft and final EIS. Plaintiff's or others' comments during the FEMA proceeding raised each of the claims alleged in this complaint.

11. Plaintiff attempted to persuade Defendants that their environmental review did not comply with the requirements of NEPA, to no avail. Plaintiff has no plain, speedy, or adequate remedy in the ordinary course of law, in that Defendants' approval of the Project and associated EIS is not otherwise reviewable in a manner that provides an adequate remedy to cure Defendants' violations of NEPA. Accordingly, Plaintiff seeks an order of this Court rectifying Defendants' violations of NEPA.

**B.    Defendants.**

12. Defendant FEDERAL EMERGENCY MANAGEMENT AGENCY is a federal agency that awarded the grant funding for the Project to FEMA's Pre-Disaster Mitigation (PDM) program and FEMA's Hazard Mitigation Grant Program (HMGP). FEMA served as the lead agency for the Project and preparation of the EIS. FEMA is organized as a separate agency within the Department of Homeland Security.

13. Defendant KAREN ARMES is the Acting Regional Administrator for Region IX of FEMA and was the final official who issued the ROD for the Project. Acting Regional Administrator Armes is sued in her official capacity. On February 26, 2015, Acting Regional Administrator Armes signed the ROD approving the EIS and the Project.

///

**C.      Other Defendants and Potentially Necessary Parties.**

14. Defendant MARK GHILARDUCCI is the Director of the California Office of Emergency Services ("Cal OES").  Cal OES is the applicant for funding of the Project.  Cal OES will oversee disbursement of awarded funds to each of the sub-applicants.  Director Ghilarducci is sued in his official capacity.

15. The Regents of the University of California is a board that governs the University of California, including the University of California, Berkeley.  The Board of Regents includes 25 voting members.  The 25 voting members of the Regents of the University of California are each sued in their official capacity.  These Defendants include RICHARD C. BLUM, WILLIAM DE LA PEÑA, GARETH ELLIOTT, RUSSELL S. GOULD, EDDIE ISLAND, GEORGE KIEFFER, SHERRY L. LANSING, MONICA C. LOZANO, HADI MAKARECHIAN, ELOY ORTIZ OAKLEY, NORMAN J. PATTIZ, JOHN A. PEREZ, BONNIE RIESS, FREDERICK RUIZ, SADIA SAIFUDDIN, RICHARD SHERMAN, BRUCE D. VARNER, CHARLENE ZETTEL, EDMUND G. BROWN, JR., GAVIN NEWSOM, TONI ATKINS, TOM TORLAKSON, SHELDON ENGELHORN, JANET NAPOLITANO, and KAREN LEONG CLANCY.  The University is one of the sub-applicants for the Project.

16. Defendant NICHOLAS B. DIRKS is the Chancellor of the University of California, Berkeley, which is one of the sub-applicants for the Project.  Chancellor Dirks has day-to-day management authority over University of California's Berkeley campus, including authority over the staff implementing the Project for the University's project areas.  Chancellor Dirks is sued in his official capacity.  The individual Regents and Chancellor Dirks are collectively referred to as "the University" in this Complaint.

17. Defendant CITY OF OAKLAND is a California municipality.  The City's Fire Department is one of the sub-applicants for the Project.

18. Defendant EAST BAY REGIONAL PARK DISTRICT is a special district and is one of the sub-applicants for the Project.

# LEGAL BACKGROUND

## THE NATIONAL ENVIRONMENTAL POLICY ACT

19.  "NEPA … makes environmental protection a part of the mandate of every federal agency and department," *Calvert Cliffs' Coord. Com. v. United States*, 440 F.2d 1109, 112 (D.C. Cir. 1971), and is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Its purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id*. § 1500.1(c).  The Council on Environmental Quality ("CEQ"), an agency within the Executive Office of the President, has promulgated regulations implementing NEPA that have been adopted by the Department of Energy.  *See* 10 C.F.R. § 1021.103.

20. NEPA's two purposes are to ensure that federal agencies undertaking a major federal action take a hard look at the proposed project's environmental impacts before deciding how to proceed, and to ensure that relevant information about the impacts of a proposed project and its alternatives is made available to members of the public, in order to provide the public with a meaningful opportunity for comment and participation in the federal decision-making process.

21. Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an environmental impact statement ("EIS").  An EIS must describe:  (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; and (3) any "alternatives to the proposed action."  *Id.*

22. The CEQ regulations require federal agencies to "[u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse impacts of these options upon the quality of the human environment."  40 C.F.R. § 1500.2(e).  The regulations emphasize that the alternatives analysis of an EIS "is the heart of the environmental impact statement," and the regulations therefore require agencies to "[r]igorously explore and objectively

1    evaluate all reasonable alternatives."  40 C.F.R. § 1502.14.  "If the agency fails to consider a viable

2    or reasonable alternative, the EIS is inadequate."  *Southeast Alaska Conservation Council v. FHA*,

3    649 F.3d 1050, 1056 (9th Cir. 2011).

4        23. Agencies must insure the professional integrity, including scientific integrity, of the

5    discussion and analysis in an EIS.  40 C.F.R. § 1502.24.  The information in an EIS must be of high

6    quality, as accurate scientific analysis, expert agency comments, and public scrutiny are essential to

7    implementing NEPA.  40 C.F.R. §§ 1500.1(b), 1502.24.   The Court's role is not to decide whether

8    the FEIS is based on the best scientific methodology available or otherwise resolve disagreements

9    among experts.  *Friends of the Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.

10   1985); *Seattle Audubon Society v. Moseley* ("*SAS I*"), 798 F. Supp. 1473, 1479 (W.D. Wash. 1992).

11   "Rather, the court's task is to ensure that the procedure followed [by the agency] resulted in a

12   reasoned analysis of the evidence before it, and that [the agency] made the evidence available to all

13   concerned."  760 F.2d at 986.  A key NEPA procedure is to "insure that environmental information is

14   available to public officials and citizens before decisions are made," 40 C.F.R. §1500.1.   This

15   includes scientific data relied upon by an EIS.  40 C.F.R. §1502.24 "requires agencies to provide the

16   public with the underlying environmental data from which an agency expert derives his or her

17   opinion."  *Siskiyou Regional Education Project v. Rose*, 87 F. Supp. 2d 1074, 1096 (D. Or. 1999)

18   citing *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998); *Earth Island Inst. v.*

19   *United States Forest Serv.*, 351 F.3d 1291, 1300-01 (9th Cir. 2003).

20       24. "An agency must also 'identify any methodologies used' and 'make explicit reference by

21   footnote to the scientific and other sources relied upon for conclusions in the [EIS].'"  351 F.3d at

22   1301; 40 C.F.R. §1502.24.  "NEPA does not permit an agency to rely on the conclusions and

23   opinions [of experts] without providing both supporting analysis and data." *Idaho Sporting Cong.*,

24   137 F.3d at 1150.  The CEQ regulations emphasize that "[n]o material may be incorporated by

25   reference unless it is reasonably available for inspection by potentially interested persons within the

26   time allowed for comment.  Material based on proprietary data which is itself not available for review

27   and comment shall not be incorporated by reference."  40 C.F.R. § 1502.21.

28

25. The CEQ regulations require that federal agencies "make every effort to disclose and discuss at appropriate points in the draft environmental impact statement all major points of view on the environmental impacts of the alternatives including the proposed action."  40 C.F.R.§ 1502.9(a).  Federal agencies are required to discuss at appropriate points in the final environmental impact statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.  *Id.* at § 1502.9(b).

26. 40 C.F.R. § 1506.6(f) expressly waives the deliberative process privilege in regard to interagency memorandum in the context of a NEPA process, requiring FEMA to make any documents underlying a DEIS "available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. § 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action."  40 C.F.R. § 1506.6(f)

27. The evaluation of mitigation measures is an essential component of an EIS.  A federal agency is required to evaluate possible mitigation measures in defining the scope of the EIS, in examining impacts of the proposed action and alternatives, and in explaining its ultimate decision.  See 40 C.F.R.  §§ 1502.14(f), 1502.16(h), 1505.2(c), 1508.25(b).

28. Federal agencies must supplement a draft or final EIS if "(1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  *Id.* at § 1502.9(c)(1); 23 C.F.R. § 771.130(a).  Federal agencies may supplement an EIS when "the agency determines that the purposes of [NEPA] will be furthered by doing so."  40 C.F.R.§ 1502.9(c)(2).

29. To be eligible for the Hazard Mitigation Grant Program, a project must:

1.  Be in conformance with the State Mitigation Plan and Local or Tribal Mitigation Plan approved under 44 CFR part 201; or for Indian Tribal governments acting as grantees, be in conformance with the Tribal Mitigation Plan approved under 44 CFR 201.7;
2.  Have a beneficial impact upon the designated disaster area, whether or not

located in the designated area;

3.  Be in conformance with 44 CFR part 9, Floodplain Management and Protection of Wetlands, and 44 CFR part 10, Environmental Considerations;

4.  Solve a problem independently or constitute a functional portion of a solution where there is assurance that the project as a whole will be completed. Projects that merely identify or analyze hazards or problems are not eligible;

5. Be cost-effective and substantially reduce the risk of future damage, hardship, loss, or suffering resulting from a major disaster. The grantee must demonstrate this by documenting that the project;

      (i) Addresses a problem that has been repetitive, or a problem that poses a significant risk to public health and safety if left unsolved,

      (ii) Will not cost more than the anticipated value of the reduction in both direct damages and subsequent negative impacts to the area if future disasters were to occur,

      (iii) Has been determined to be the most practical, effective, and environmentally sound alternative after consideration of a range of options,

      (iv) Contributes, to the extent practicable, to a long-term solution to the problem it is intended to address,

      (v) Considers long-term changes to the areas and entities it protects, and has manageable future maintenance and modification requirements.

30. FEMA has further determined that, to be eligible for funding, the proposed action or alternative must:

1. Be technically feasible and implementable;

2. Solve a problem independently, consistent with 44 CFR § 206.434(c)(4);

3. Be cost effective and able to substantially reduce the risk of future damage, hardship, loss, or suffering resulting from a major disaster, consistent with 44 CFR § 206.434(c)(5) and related guidance;

4. Have a benefit-cost analysis using a FEMA-approved methodology that results in a benefit-cost ratio of 1.0 or greater;

5. Provide for long-term effectiveness and benefits (between 5 and 10 years, depending on the type of action);

6. Be consistent with the goals and objectives identified in the current FEMA-approved state mitigation plan and local mitigation plan for the jurisdiction in which the action would occur

7. Conform to 44 CFR parts 9 and 10 and with all applicable environmental and historic preservation laws, implementing regulations, and executive orders, including the National Environmental Policy Act (42 U.S.C. §§ 4321-4347), National Historic Preservation Act of 1966 (16 U.S.C. §§ 470 et seq. ), Endangered Species Act (16 U.S.C. §§ 1531-1544), Executive Order 11988 (Floodplain Management), Executive Order 11990 (Protection of Wetlands), and Executive Order 12898 (Environmental Justice);

8. Not duplicate benefits available from another federal source for the same purpose or assistance that another federal agency or program has the primary authority to provide;

9. Be located in a community that is participating in the National Flood Insurance Program (NFIP) and is not on probation, suspended, or withdrawn from the NFIP if the community has been identified as having a Special Flood Hazard Area (SFHA) through the NFIP (i.e., a Flood Hazard Base Map or Flood Insurance Rate Map has been issued to the entity); there is no NFIP participation requirement for HMGP and PDM programs project applications for projects located outside an SFHA;

10. Meet the requirements of applicable local, tribal, state, and federal laws; implementing regulations; and executive orders.

### FACTUAL BACKGROUND

31.  The Project includes the funding of vegetation management work within 60 project areas on lands owned by EBRPD, the University, and the City of Oakland in the East Bay Hills within Alameda and Contra Costa Counties, California.  Another 45 distinct areas are on EBRPD lands that are geographically related to the project areas and included in the EIS review as connected areas to the Project but are not proposed to receive any funding from FEMA.

32. The 60 project areas included for funding by the Project encompass a total of 998.3 acres in the East Bay Hills.

33. The need for vegetation management in the East Bay Hills arises from the repetitive nature of wildfires in that area and the proximity of residential areas to open spaces that are susceptible to fires.  Most of the undeveloped areas in the East Bay Hills are identified as very high fire hazard severity zones by the California Department of Forestry and Fire Protection.  Factors contributing to the high fire risk in the area include hot and dry fall seasons, wind-conducive topography, flammable vegetation, dense development, lack of pumping facilities and water for fighting fires in residential areas, and limited accessibility for firefighting.

34. The East Bay Hills contain many areas with dense flammable vegetation.  The primary vegetation types of concern are smaller trees and shrubs that are more fire prone as well as trees with low hanging branches that can be ignited by more easily lit grass fires and that are surrounded by loose, dead material at their bases.  The combination of litter build-up and extensive ladder fuels with the heavy forest fuels contributes to high-intensity fires and increased potential for fires laddering up

into the crowns, which allows fires to spread much farther.  Longer flame lengths and greater heat output are associated with increased fire intensity.  The goals of the project are to reduce fuel loading and fire intensity and to reduce the potential for crown fires.

35. The University seeks funding for vegetation management on 56.3 acres within Strawberry Canyon and 42.9 acres within Claremont Canyon.  The University's proposed vegetation management consists mainly of clear-cutting of eucalyptus, acacia, and pine trees and depositing up to two feet of wood chips over 20 percent of these two canyons.

36. The University's proposed vegetation removal in Strawberry Canyon is expected to require 20 to 40 weeks spread over 3 to 6 years. In general, work would be conducted from August through November to avoid the wet season and the bird nesting and fledging season. Skidding of cut trees and logs would not be performed after a heavy rain.  Twice a year, herbicides (Garlon 4, Garlon 3A, Stalker, or Roundup3 [glyphosate]) would be applied to any sprouts emerging from stumps.  The EIS does not describe how other revegetation management, if any, would be conducted in this area. In the absence of a plan to control vegetation growth in clear-cut areas for the ten-year duration of the Project, there will be an explosion of broom, thistle, hemlock, and poison oak in these clear-cut areas and they will be more fire prone than before the Project.

37. The University's Claremont Canyon project area is largely a eucalyptus forest. The proposed vegetation management activities and mitigation measures are the same as for Strawberry Canyon-PDM.  About 10,000 trees would be cut down, mainly eucalyptus with some pine and acacia. As with Strawberry Canyon, the goal is removal of eucalyptus, Monterey pine, and acacia.  The University anticipates that completion of the proposed work would extend over a period of 2 to 6 years, with 20 to 35 weeks of actual vegetation removal work.  In general, work would be conducted in August through November to avoid the wet season and avian nesting and fledging seasons.  Twice a year, herbicides (Garlon 4, Garlon 3A, Stalker, or Roundup [glyphosate]) would be applied to any sprouts emerging from stumps.  The EIS does not describe how other revegetation management, if any, would be conducted in this area.  In the absence of a plan to control vegetation growth in clear-cut areas for the ten-year duration of the Project, there will be an explosion of broom, thistle,

hemlock, and poison oak in these clear-cut areas and they will be more fire prone than before the Project.

38. Oakland seeks funding for vegetation management in six project areas covering 359 acres of land owned by Oakland, the University, and EBRPD. The City's application includes a 185.2 acre project area to be implemented by the University known as the Frowning Ridge-PDM project. The City's application also includes three project areas to be implemented by EBRPD, including work in Tilden Regional Park, Sibley Volcanic Regional Preserve, and a portion of Claremont Canyon (the Claremont Canyon-Stonewall project area). Oakland itself seeks funding for vegetation management work in two areas encompassing 122 acres – the North Hills-Skyline and Caldecott Tunnel project areas. Oakland's proposed vegetation management in these two areas consists mainly of clear-cutting of eucalyptus and pine trees and depositing up to two feet of wood chips over 20 percent of this area.

39. Oakland's 68-acre North Hills Skyline project area is on the southwest side of Grizzly Peak Boulevard north of State Route (SR) 24 and above the Caldecott Tunnel. It includes eucalyptus, pine, and brush. Oakland's goals are to remove eucalyptus and Monterey pine and to convert brush to grassland along Grizzly Peak Boulevard to create a "ridgeline fuel break." Eucalyptus would be chipped, and the chips would be spread over a maximum of 20% of the site at a maximum depth of 24 inches. Eucalyptus resprouts and new seedlings would receive follow-up herbicide treatment twice a year with Garlon4, Stalker, or Roundup as required to remove eucalyptus from the site. Oakland indicates that the vegetation removal work will take from 12 to 24 months. The EIS does not describe how other revegetation management, if any, would be conducted in this area. In the absence of a plan to control vegetation growth in clear-cut areas for the eight to nine remaining years of the Project, there will be an explosion of broom, thistle, hemlock, and poison oak in these clear-cut areas and they will be more fire prone than before the Project.

40. Oakland's 54-acre Caldecott Tunnel project area is on the east side of Broadway and SR 24, south of the southwestern end of the Caldecott Tunnel. Proposed activities are limited to the areas dominated by eucalyptus, which are in the northern and eastern sections of the site. Oakland's

goal for the Caldecott Tunnel project area is conversion from a eucalyptus-dominated forest to annual grassland and eventually to coastal scrub. Eucalyptus would be chipped, and the chips would be spread on up to 20% of the site with a maximum depth of 24 inches. To suppress resprouting of eucalyptus, the cambium ring of stumps would be treated with herbicides twice a year. Oakland indicates that the vegetation removal work will take from 12 to 24 months. The EIS does not describe how other revegetation management, if any, would be conducted in this area. In the absence of a plan to control vegetation growth in clear-cut areas for the eight to nine remaining years of the Project, there will be an explosion of broom, thistle, hemlock, and poison oak in these clear-cut areas and they will be more fire prone than before the Project.

41. Although included in Oakland's FEMA application, the University owns the 185.2-acre Frowning Ridge proposed project area and will be the sub-applicant performing the vegetation management in this area. The University proposed to remove fire-prone vegetation, including all eucalyptus, Monterey pine, and acacia. Approximately 25,000 eucalyptus and pine trees up to 48 inches diameter at breast height ("DBH") would be cut down. As for its other project areas, herbicides will be applied twice per year to eucalyptus stumps. Once trees are clear-cut, no other revegetation management is identified in the EIS for the 10-year life of the project. Eucalyptus would be chipped, and the chips would be spread on up to 20% of the site with a maximum depth of 24 inches. Completion of the proposed vegetation removal at Frowning Ridge is expected to require 40 to 60 weeks spread over 2 to 3 years. Again, work would be conducted from August through November to avoid the wet season and the bird nesting and fledging season. The EIS does not describe how other revegetation management, if any, would be conducted in this area. In the absence of a plan to control vegetation growth in clear-cut areas for the three to five years of the Project, there will be an explosion of broom, thistle, hemlock, and poison oak in these clear-cut areas and they will be more fire prone than before the Project.

42. In August 2014, the University clear-cut approximately 7.5 acres of the 185.2-acre parcel at Frowning Ridge. According to the University, they felled 150 eucalyptus, Monterey pine, and acacia trees and applied an herbicide to eucalyptus and acacia stumps. In undertaking these actions

prior to issuance of the final EIS, the University failed to comply with the specific conditions of the grant and NEPA requirements which limit applicant action during the NEPA process under 40 CFR §1506.1.  Both required the University to refrain from action until FEMA had completed its environmental review.  As a result, the Frowning Ridge parcel is no longer eligible for FEMA funding.  This portion of Oakland's and the University's funding application was denied by FEMA and not included in FEMA's Record of Decision.

43. EBRPD applied for funding for vegetation management on 540.2 acres within 11 of its regional parks located along the East Bay hills.  Rather than relying on clear-cutting, EBRPD's vegetation management would emphasize reducing fuel loads primarily by removing smaller eucalyptus and pine trees and underbrush while leaving larger trees in place with their lower limbs removed to a safe height.  Oak and bay trees would be preserved.  EBRPD would accomplish this through implementation and long-term maintenance of tree and brush removal (mechanical and hand), herbicide treatment, and, although not funded by FEMA, animal grazing, pile burning, and broadcast burning.  EBRPD's vegetation management methods are based on its Wildfire Hazard Reduction and Resource Management Plan.  The plan recommends selective thinning of areas dominated by plant species that contribute fuel to wildfires.  Eucalyptus, Monterey pine, and acacia trees would be targeted to reduce the number of trees per acre or to remove entire groves. Lower limbs would be removed from remaining trees and woody debris would be removed from under the trees.  EBRPD would take this same general approach in the three proposed EBRPD projects included in the City of Oakland's grant application.

44. EBRPD would leave some logs on site placed as a component of the sediment and erosion control measures, to improve wildlife habitat and promote long-term soil productivity. Trees would be removed from the project areas or, in some cases, chipped and left on site. Wood chips left on site would be spread over up to twenty percent of each site to an average depth of 4 to 6 inches.

45. The connected actions occurring on other EBRPD lands involve a total of approximately 1,060.7 acres.  The total amount of land involved in the actions addressed in the EIS, including both lands for which funding is sought and the connected areas, is approximately 2,059 acres.

46. The EIS evaluates only two alternatives for the project – a no action alternative and the Project itself.  During the scoping period, Plaintiff provided comments documenting the feasibility of a selective thinning alternative applicable to the entire Project area, which would rely on removing brush and surface fuels as well as smaller eucalyptus and pine trees, and retaining larger trees though removing lower limbs.  Nevertheless, as of the release of the DEIS, FEMA and the sub-applicants rejected such an alternative out-of-hand.  The EIS claims that, even with removal of surface fuels, smaller trees, and lower limbs of larger trees, remaining taller trees would still catch fire and create embers that would travel up to a half mile away.  However, in other parts of the EIS, FEMA acknowledges that "[t]orching can be greatly reduced by removing surface fuels and "ladder fuels," which include lower limbs, smaller trees, hanging strips of eucalyptus bark, and shrubs that can carry a fire up into the treetops (the crown or canopy)."  There also is no evidence in the record that torching from the species that replace the eucalyptus and pine trees as a result of the Project would not be a hazard.

47. The EIS rejects consideration of the selective thinning alternative based on the conclusion that it "would likely be prohibitively expensive and increase erosion by disturbing soils."  "For these reasons, this alternative fuel reduction program would not meet the purpose and need and was eliminated from further study."

48. Without citation or reference, the EIS claims that "[r]epeated removal of ladder fuels is expensive and can be difficult on the steep slopes so common in the proposed and connected project areas."  Because a selective thinning alternative is rejected out of hand, no comparison of the costs of this alternative with the proposed Project is provided.  The EIS does not address the evidence provided in the record that EBRPD's approach, which relies to a great extent on selective thinning, is substantially less costly per acre than the clear-cutting methods proposed by the University and Oakland.  The proposed EBRPD treatments cost approximately $4,444/acre compared to over twice that cost per acre for the proposed UC treatments, and over three times that for the Oakland treatments.

49. The EIS asserts that continuous regular maintenance on steep slopes can destabilize soils and lead to erosion. This general assertion is not accompanied by any description of the likely maintenance intervals that a selective thinning alternative would require. The EIS contains no discussion, explanation, or citation to evidence explaining how an alternative relying on hand removal of underbrush and small trees would pose a more serious erosion threat to than clear-cutting that requires the use of heavy machinery on the same slopes.

50. Without citation or reference, the EIS vaguely asserts that "a program of only removing brush, debris and small trees does not adequately address the special characteristics of eucalyptus and Monterey pine trees that can make wildfires difficult or even impossible to control." Scientific studies and expert comment provided to FEMA by Plaintiff demonstrate that this is not the case and a selective thinning alternative is feasible and must be considered in the EIS.

51. HCN's expert, Fire Behavior Analyst Kelly Close, presented studies specific to fire risk reduction in eucalyptus forests that do not support clear-cutting of eucalyptus trees as an effective means of minimizing fire risks. The DEIS completely ignores widely accepted hazard reduction practices in eucalyptus forests of Australia. In Australia, where eucalyptus forests are widespread and comprise much of the native vegetation, hazard reduction treatments do not entail total canopy removal. Rather, the typical treatment is reduction of surface fuels. In eucalyptus forests, the greatest hazards are intense surface fires and long-range spotting from bark. Reducing surface fuels has been found to be greatly successful in reducing these hazards, as well as minimizing the potential for crown fire.

52. Further, it has been found that eucalyptus trees actually help reduce fire hazard by breaking up turbulent flow dynamics of strong winds and reducing the hazard from flying embers. "Clear cutting gum barks reduces safety from firestorms, both along the Urban Wildland Interface as well as internal defensible space areas where they assist with high-risk ground fuel mitigation" (Lofft, 2010). For this reason, taller eucalyptus trees such as blue gum are now used for wind and fire protection in many locations.

53. The EIS cites no evidence to support the contention that tree thinning and surface fuels management is not a viable alternative to the clear-cutting proposed for funding by Oakland and the University.  FEMA's own consultant – URS Corporation – informed FEMA that thinning and ladder fuel removal was a feasible treatment option and "should be evaluated in future NEPA documents."

54. The EIS in fact acknowledges that thinning and removal of understory fuels is an acceptable approach to fire hazard mitigation.  The revised project described in the final EIS incorporates what FEMA terms the "Unified Methodology," changing portions of several treatment areas identified by the University and Oakland and claiming to require treatment strategies similar to those employed by EBRPD near those areas.

55. Instead of complete removal of all eucalyptus within the first 2 years, the Unified Methodology would focus on reducing fire fuels within 100 feet of structures. In these subareas, the lower branches of all trees would be limbed to a minimum height of 8 feet, and understory vegetation would be removed. Shrubs would be thinned to a minimum spacing of 6 feet. Oak and bay trees will be retained, and all shrubs under them removed.  Eucalyptus trees will remain, at an average spacing of 35 feet, with a clear understory. Tall trees prone to torching would be removed. No understory would remain near trees that are retained. Under the Unified Methodology, and as described for EBRPD project areas, trees meeting the following conditions would remain intact in the initial phase: Located low on the slope;  Healthy;  Structurally sound;  Larger than 24 inches in diameter;  Have lower branches that start no lower than 20 feet from the ground, and;  Separated from other tall trees prone to torching by 35 feet.

56. Under the Unified Methodology, based on the results of monitoring for accumulation of fuel volume and potential for torching to occur, additional trees would be removed based on an assessment to be made 5 years after the initial implementation of treatment activities.  Progress toward meeting the goals for fire hazard reduction and habitat creation for listed species would be evaluated and treatment efforts may be adjusted accordingly.  Under the Unified Methodology, complete eradication of the targeted tree species could still occur over a five to ten year period.

57. The University proposes to apply the Unified Methodology to three subareas of Strawberry Canyon totaling 12.4 acres.  The University also proposes to apply the Unified Methodology to a 9.7-acre subarea of the 42.8-acre Claremont Canyon project area.  Oakland identifies 3.5 acres within the North Hills-Skyline project area where the Unified Methodology will be applied.  Oakland also proposes to apply the Unified Methodology to 2.9 acres of the 53.6-acre Caldecott Tunnel project area.

58. The Unified Methodology is not the alternative proposed by HCN.  HCN proposed that all of the Project area apply a selective thinning strategy.  The Unified Methodology only applies to portions of the University and Oakland treatment areas and, although reflecting thinning strategies in the earlier years of the Project, does not rely on such strategies for the duration of the project.  Instead, it appears to simply delay the clear-cutting described in the DEIS.  The FEIS continues to take the position that a selective thinning project alternative "would not meet the purpose and need and was eliminated from further study."  *Id.*, p. 3-4.  Now, though tentative, the FEIS tries to reverse course for some of the treatment areas, acknowledging that "areas were identified as places where the Unified Methodology would allow for wildfire hazard reduction that is equivalent in its effectiveness to that previously described in the draft EIS."  FEIS, p. 3-23.

59. FEMA's refusal to analyze a selective thinning alternative in the EIS is not supported by its fire modeling efforts.  Fire behavior modeling conducted for the DEIS (FlamMap) included an assessment of the no-treatment alternative and the chosen, aggressive treatment alternative involving removal of all eucalyptus, Monterey pine and acacia trees. No modeling was done to assess the effectiveness of any alternative, less aggressive selective thinning strategy nor any longer-term post-treatment fire hazard conditions.   The modeling conducted for the Project only analyzed the situation the day after the trees are cut rather than analyzing the fire behavior that would be expected when broom, hemlock, thistle, and poison oak take hold in areas clear-cut of trees.  Even if one were to assume that somehow these fire-prone invasives were to be beat back, and that the result would eventually be an oak, bay, grass, and chaparral environment, the fire behavior of even that

1   environment isn't analyzed.  In short, the modeling that was done analyzed an environment that

2   would only exist for a few weeks.

3       60. Critically, none of the fire behavior modeling in the DEIS addressed the Vesta model

4   developed by Australian researchers specifically for assessing fire behavior in eucalyptus fuel types.

5   Vesta was developed based on extensive field research in which 104 fires were set in eucalyptus

6   forests to study fire behavior under an array of variables.

7       61. Vesta determines a separate hazard rating for surface and near-surface fuels and bark

8   fuels.  It then determines the rate of spread based on surface and near-surface fuel characteristics, and

9   fuel moisture.  Rate of spread and firebrand production are directly related to surface and near-

10  surface fuels, as well as bark fuels.  Finally, the surface fuel hazard rating is combined with the bark

11  hazard rating and wind speed to determine the spotting potential.  Vesta's real strength is that it is the

12  only fire behavior prediction system that is specific to eucalyptus fuel types.

13      62. Although the FEIS now includes the Vesta model in its list of references, the EIS does not

14  contain any discussion or analysis of this modeling option.  As HCN's expert Kelly Close explained,

15  this is a serious oversight considering the majority of the proposed hazard reduction work involves

16  eucalyptus.

17      63. During the EIS process, FEMA did not make public the data used for its fire behavior

18  modeling. This made it impossible for members of the public and other agencies to independently

19  assess alternatives to the two alternatives analyzed in the EIS.

20      64. Removing all eucalyptus, Monterey pine, and acacia trees will be a severe site

21  disturbance. Such catastrophic site disturbances that include extensive canopy removal do not favor

22  the less invasive native species such as oak or bay trees, but rather favor more invasive species.  This

23  phenomenon has been documented on numerous mechanical fuel treatments in the California Bay

24  Area that are similar to actions proposed by the University and Oakland in their areas of the Project.

25  Without further long-term maintenance that includes extensive planting of other species, the proposed

26  actions by the University and Oakland will not differentially favor native species, but will simply

27  favor invasive, highly flammable brush species, both native and non-native, leading to dangerous,

28

intense, and destructive wildfires.  The net effect is essentially trading one fire hazard for another, at a significant dollar cost and detriment to the local ecosystems.

65. The EIS justifies depositing up to 24 inches of mulch, primarily from eucalyptus trees, on the ground surface based on research involving decomposition and fire hazard posed by no more than 6 inches of mulch.  The EIS fails to acknowledge research that highlights the high potential for spontaneous combustion in deeper accumulations of mulch, the difficulty of fire suppression in such fuels, the severe long-term damage to soils by the intense heating in mulch and wood chip fires, and the documented spotting danger posed by mulch and other forms of masticated fuels.  HCN's expert provided evidence that deposition of two-feet of wood chips on the surface of the ground does not follow sound fire management practices and has the net effect of increasing surface fuel loads.

66. Wood chips and mulch pose a significant fire hazard in and of themselves.  Mulch fires are common in landscaping and mulch fires can pose a serious risk of devastating fires.  FEMA's consultant, URS Corporation, stated that "[s]tudies have shown that mulch layers actually can pose a fire risk depending upon the type of material, the depth of the mulch, and the climate at the mulch site."  Studies have demonstrated that ignition by cigarettes or matches can result in a smoldering, subsurface fire in a variety of mulch materials at a depth of only 4 inches.

67. Deep accumulations of mulch are also highly susceptible to spontaneous combustion.  Spontaneous ignition in mulch piles poses a potential for catastrophic fires.  There is a greater ignition potential of mulches high in oil.  Fires that ignite through spontaneous combustion or by other means of ignition may smolder and spread beneath the surface for days before being detected, making suppression of those fires extremely difficult and time-consuming.  Mulch fires can continue for periods of months and create considerable smoke with health implications.

68. With hot, dry weather and strong winds, mulch fires – particularly those not yet detected – pose a serious threat to surrounding wildlands.  In 2012, the Lower North Fork Fire in Colorado originated from a prescribed burn of masticated fuels (essentially a coarse mulch) varying from three to six inches in depth.  In subsequent days of patrol and mop-up, the burn appeared to be cold and dead.  The fourth day post-burn, a strong, dry wind caused these "cold" fuels to begin actively

burning again, resulting in a catastrophic, escaped wildfire that destroyed 23 homes and killed three people (Bass, 2012).

69. Given the warmer, drier conditions on the treated sites after canopy removal, the high oil and volatile chemical content of eucalyptus fuels, and the frequent occurrence of strong winds in the proposed treatment areas, expert evidence indicates that the deposition of eucalyptus mulch outlined in the EIS will pose a very significant fire hazard for a number of years post-treatment.

70. In 1999, the Bay Area Air Quality Management District ("BAAQMD") published thresholds of significance for air pollutants emitted in the San Francisco Bay area.  BAAQMD adopted a threshold of 15 tons per year for Reactive Organic Gases ("ROGs"), 15 tons per year for Nitrogen Oxides ("NOx"), and 15 tons per year for Fine Particulate Matter ("$PM_{10}$").

71. The EIS does not rely upon BAAQMD's thresholds of significance.  Instead, the EIS relies upon "*de minimis* levels" derived from the EPA Conformity Review Rule to determine if Federal actions comply with the national ambient air quality standards.  FEMA's application of the *de minimis* levels is arbitrary because the levels were identified based on the availability of federal agency resources to conduct a multitude of General Conformity analyses, rather than with any intent to determine a significance threshold for potential environmental impacts under NEPA.  Although the levels set forth in the EPA Conformity Review Rule may be reasonable emission levels at which a particular project may not violate by itself ambient air quality standards, the levels do not identify and do not preclude significant air pollution impacts or possible cumulative impacts under NEPA.

**PROCEDURAL BACKGROUND**

72. A notice of intent to prepare an EIS for the proposed action was published in the *Federal Register* on June 10, 2010.  The notice of intent initiated a public scoping period that concluded on October 1, 2010.  FEMA conducted two public scoping meetings on August 26, 2010 at the EBRPD Trudeau Center.  On September 30, 2010, HCN submitted written scoping comments.  HCN made oral comments at the scoping meeting held on August 26, 2010.

73. In July 2011, HCN sent a FOIA request to FEMA specifically asking for documents relating to expert opinions of the proposed Project by the U.S. Forest Service and the U.S. Fish &

Wildlife Service.  On October 22, 2012, FEMA responded by providing totally redacted versions of documents submitted by those and other agencies.  FEMA claimed for the most part a deliberative process privilege.  HCN followed up with additional FOIA requests for the same memorandums, among other documents.  No documents were provided as of the date of publication of the ROD.

74. A Notice of Availability of the draft EIS was published in the *Federal Register* on May 3, 2013, and the public comment period extended from May 3, 2013 to June 17, 2013. On June 17, 2013, HCN submitted extensive comments on the DEIS, including the review and comments of expert Fire Behavior Analyst Kelly Close.  FEMA received over 13,000 comment submittals on the project via letter, email, fax, petitions, comments submitted at the public meetings, and voicemail. The vast majority of more than 13,000 comments were critical of the proposed Project.  HCN made oral comments at one of the three public meetings on the DEIS held by FEMA.

75. On May 8, 2013, HCN requested FEMA to allow HCN access to all of the studies and documents referenced in the DEIS that were not otherwise posted on the Project's web-site or available by a functional web-link in the DEIS.   FEMA staff responded promptly that day, indicating that it was passed on to FEMA Region IX's regional counsel.  On May 9, 2013, the FEMA regional counsel indicated that HCN's document request would have to be submitted as a formal request under the Freedom of Information Act and were not available at that time for an in-person inspection despite the 53-day comment period.  On May 10, 2013, HCN objected to the delay in providing HCN access to referenced documents for the entire comment period and resubmitted its request as a FOIA request.  In its request, HCN also requested access to all of the data that was utilized in the fire models relied upon by the DEIS' analysis as well as data and cost analyses relied upon to reject alternatives to the proposed Project.  On May 21, 2013, FEMA responded, stating that it did not believe any of the many documents listed in the DEIS as "References" were incorporated by reference into the DEIS and, hence, the agency would not provide them, apparently even pursuant to HCN's FOIA requests, except by updating web links once a final EIS is issued.

76. On or about December 1, 2014, FEMA released the FEIS for the Project.  FEMA provided for a 30-day comment period on the FEIS.  On December 30, 2104, HCN submitted additional comments on the FEIS and Project.

77. The various oral and written comments submitted by HCN over the course of FEMA's EIS process raised each of the issues and claims set forth in this Complaint.

78. On February 26, 2015, Defendant Armes signed the Record of Decision for the Project.

79. Defendants FEMA and Armes are threatening to proceed with the execution of the grant award by the immediate payment of funds to Cal OES.  Upon receipt of the funds, Cal OES will be in a position to release funds to the sub-applicants.  Although tree cutting and other vegetation management activities are not expected to occur until August 2015, FEMA's release of funds that are then spent by the applicants is an irretrievable commitment of resources that should be enjoined pending FEMA's compliance with NEPA.  Defendant University's and Oakland's initiation of vegetation management activities, including clear-cutting operations within the Strawberry Canyon, Claremont Canyon, North Hills-Skyline and Caldecott Tunnel project areas, will irreparably harm the environment in that Defendants will commence with clear-cutting activities without compliance with NEPA, resulting in fire risk, air pollution, aesthetic, and other environmental impacts to Plaintiff. Preliminary and permanent injunctions should issue restraining Defendants from proceeding with the payment of grant funds to Cal OES and/or the sub-applicant Defendants and enjoining ground-disturbing activities by the sub-applicant Defendants.

**FIRST CLAIM FOR RELIEF**
**(Violation of NEPA and APA – Failure to Adequately Evaluate a Reasonable Range of Alternatives, Disclose Underlying Data, Discuss Responsible Opposing Scientific Views, and Adequately Evaluate Impacts)**

80. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

81. The EIS prepared by FEMA for the Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law for the following reasons:

a.   The EIS fails to consider a reasonable range of alternatives, in particular the arbitrary elimination for review of a selective-thinning alternative despite that alternative's ability to feasibly achieve the project's purpose and goals. FEMA's assertions in the EIS that selective-thinning would "likely be prohibitively expensive and increase erosion by disturbing soils" or "does not adequately address the special characteristics of eucalyptus and Monterey pine trees that can make wildfires difficult or even impossible to control" are not supported by the record and are inconsistent with other statements in the EIS.

b.   The EIS and FEMA fail to disclose to commenters the scientific data and inputs it relied upon in conducting its fire modeling effort, a key analysis undergirding the EIS, as well as a failure to disclose other important references. These failures were despite HCN's efforts to obtain the documents through informal and Freedom of Information Act ("FOIA") requests. As a result of FEMA's unwillingness or inability to provide HCN access to numerous documents referenced in the EIS as well as the data underlying the modeling and key conclusions in the EIS, HCN's and its consultants' review of the EIS and its supporting materials has been substantially compromised.

c.   The EIS fails to describe or analyze for the full life of the project the environmental effects of substantial vegetation maintenance that will have to occur after the funded vegetation management, especially clear-cutting, is complete, or to model the fire risks that may be present at the end of ten years of vaguely defined maintenance.

d.   The EIS fails to disclose or discuss responsible opposing scientific views and contrary expert agency comments, including the use of the more accurate Vesta model, the expert comments of Kelly Close, and critiques of the project submitted by the US Forest Service but not disclosed to the public.

e.   The EIS fails to address impacts, including increased fire risks, associated with

1  vegetation maintenance activities that will occur once the Project's proposal to

2  cut down entire groves and parcels of trees has occurred. Although the DEIS

3  acknowledges the Project's need to treat resulting tree trunks with herbicides

4  twice a year for several years after they are cut, the DEIS's project description

5  does not mention the other treatment actions that also must occur to prevent,

6  for example, the areas disturbed by large-scale tree removals from being

7  occupied by exotic weeds, such as thistle, French broom, and pampas grass.

8  f.  The EIS fails to mention fire risk posed by disposing of wood chips in large

9  areas up to two feet deep.

10  g.  The EIS arbitrarily assumes that thick layers of wood chips will promote native

11  species rather than non-native species.

12  h.  The EIS arbitrarily applies air pollutant thresholds of significance that have

13  nothing to do with the region where the project is located and ignores technical

14  thresholds developed by the Bay Area Air Quality Management District

15  ("BAAQMD") implementing federal air standards in the project area.

16  i.  The EIS unreasonably assumes that the Project that will be implemented over

17  one to three years will nevertheless emit all of its air pollutants over ten years.

18  j.  The EIS fails to describe necessary air pollution mitigation measures.

19  k.  The EIS fails to discuss impacts of diesel particulate matter and relevant

20  mitigation measures.

21  l.  The EIS arbitrarily assumes that the project's GHG emissions will be spread

22  out over ten years.

23  m.  The EIS' GHG analysis fails to account for the Project's elimination of carbon

24  sequestration per year that will result from cutting down upwards of 100,000

25  trees.

26  n.  The EIS arbitrarily applies a GHG pollution emission rate that the Council on

27  Environmental Quality ("CEQ") states is not a significance threshold.

28

o.   The EIS fails to describe feasible mitigation measures to address the project's GHG emissions and elimination of current annual carbon sequestration.

p.   The EIS fails to consider that the Project's elimination of summer fog drip in fire prone areas that will increase fire risk.

q.   The FEIS fails to respond adequately or at all to HCN's and its experts' comments on the DEIS, including but not limited to each of the issues identified in this paragraph.

82. FEMA's failure to prepare an adequate EIS violated and is continuing to violate Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C).

83. FEMA's failure to prepare an adequate EIS and issuance of the ROD in reliance on the deficient EIS is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and set aside by this Court.

**SECOND CLAIM FOR RELIEF**
**(Violation of NEPA and APA – Failure to Issue Supplemental EIS)**

84. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

85. The FEIS' change to the project to include the Unified Methodology on portions of both Oakland's and the University's Project areas is a substantial change in the proposed action relevant to environmental concerns.  As a result, FEMA was required to treat that change as a supplement to the draft EIS, including providing a notice and comment period for members of the public and other agencies.  40 CFR § 1502.9(c).

86. FEMA's failure to issue the FEIS as a supplement to the draft EIS is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and the FEIS and ROD set aside by this Court until a supplement to the draft EIS is properly completed.

**THIRD CLAIM FOR RELIEF**
**(Violation of Hazard Mitigation Grant Program Criteria and APA – Arbitrary Application and Unsupported Decisions for Criteria Set Forth at 44 C.F.R. § 206.434(c))**

87. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

88. FEMA's approval of grant funding under the PDM and HMGP programs fails to apply the criterion requiring FEMA to evaluate a range of options and arbitrarily applies the applicable regulatory criteria.

89. FEMA's effort to avoid considering an expanded alternative relying on selective thinning, similar to the selective thinning that EBRPD is planning on carrying out on many of its parcels, overlooks one of the "minimum project criteria" set forth in FEMA's Hazard Mitigation Grant Program and applied to the PDM application process:  "To be eligible for the Hazard Mitigation Grant Program, a project must:  … (iii) Has been determined to be the most practical, effective, and environmentally sound alternative ***after consideration of a range of options***…."  44 C.F.R. § 206.434(c)(v)(iii) (emphasis added).  Notably, the criteria listed in the DEIS make no mention of this mandatory, minimum criterion.  The one clear option for FEMA to consider here is a Selective Thinning Alternative for all parcels covered by the requested grants.  As discussed further below, given EBRPD's reliance on selective thinning and surface and ladder fuel removal for many of its parcels and an expert analysis confirming that management works as well and at less cost than the proposed clear-cutting projects, a Selective Thinning Alternative must be considered to meet Section 206.434(c)(v)(iii)'s criterion.

90. "To be eligible for the Hazard Mitigation Grant Program, a project must:  … 5) … (iv) Contributes, to the extent practicable, to a long-term solution to the problem it is intended to address…."  FEMA further refined this criterion for the Project, stating that to be eligible either for the HMGP or PDM funds, the Project must "[p]rovide for long-term effectiveness and benefits (between 5 and 10 years, depending on the type of action)."  Even if all eucalyptus and Monterey pines are removed from an area, hand labor will be required to keep exotic weeds from establishing themselves in addition to the hand labor necessary to coat stumps with herbicides.  Because the EIS

and ROD fail to address the revegetation and management activities, including expanded use of herbicides, that will be required in order for the University and Oakland to prevent weeds and exotic species from proliferating within the clear-cut areas, FEMA has no reasonable evidence upon which to base a conclusion that clear-cutting large trees over the Project's ten year lifespan will be effective in creating a fire-safe environment.

91. FEMA's decision to award grants to Oakland and the University without considering or with insufficient evidence to justify these grant criteria is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2), and should therefore be declared unlawful and the grant awards for these sub-applicants set aside by this Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1.   Issue a declaratory judgment that the EIS prepared by FEMA in connection with its decision to approve the Project violated and is violating NEPA and the Administrative Procedure Act;

2.   Issue an order vacating, in whole or in part, the EIS and the ROD;

3.   Order the Defendants FEMA and Karen Armes to prepare, circulate and consider an EIS consistent with the requirements of NEPA and its implementing regulations.

4.   Preliminarily and permanently enjoin Defendants from distributing funds for the Project;

5.   Preliminarily and permanently enjoin Defendants from initiating any activities in furtherance of the Project that could result in any change or alteration to the physical environment unless and until Defendants FEMA and Karen Armes prepare an EIS that complies with the requirements of NEPA and reconsider the awarding of grants to those sub-applicants.

6.   Award Plaintiff its reasonable attorneys' fees and its costs, expenses and disbursements associated with this action.

///

///

7. Grant Plaintiff such additional and further relief as the Court may deem just and proper.

DATED: March 6, 2015

Respectfully submitted,

Michael R. Lozeau
LOZEAU DRURY LLP

Attorneys for Plaintiff